UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

WILLIAM CRENSHAW,

                Petitioner,                          **DECISION AND ORDER**

        -vs-                              No. 02-CV-6623

SUPERINTENDENT OF FIVE POINTS
CORRECTIONAL FACILITY,

                Respondent.

## INTRODUCTION

William Crenshaw ("Crenshaw") filed this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in New York State Supreme Court (Monroe County). The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(b).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The conviction at issue in the instant habeas petition stems from the armed robbery of Robert Harris ("Harris"), a parking lot attendant for All-Right Parking in the City of Rochester. On the morning of May 2, 1997, Harris was working in his booth when a black male wearing a pair of camouflage pants and a camouflage jacket entered the booth, drew a gun, and demanded the money that Harris was counting at the time. When Harris dropped the money, the robber grabbed it and ran towards Franklin Street. Harris chased the perpetrator across the street and observed him run past the drive-through window of a bank located across the street. At that point, Harris abandoned his pursuit of the robber and asked a parking meter monitor to call 911.

-1-

A mounted police officer with the Rochester Police Department happened to be in the vicinity and responded to the scene. Harris informed him that the robber was a black male with a short build wearing camouflage pants and a camouflage jacket. Harris described the gun as a small, dark-colored automatic pistol. The description was broadcast, and, almost simultaneously, another police officer saw a person matching the description jogging a short distance from the robbery scene and dressed in camouflage pants and a blue hooded sweatshirt. The suspect, later identified as Crenshaw, was carrying a camouflage jacket under his arm. The second police officer stopped his car and called out to Crenshaw that he wished to speak with him. Crenshaw glanced at the officer and began running away down Lyndhurst Street. Crenshaw leapt over a fence and ran through some backyards, whereupon the officer lost sight of him.

About a minute and a half later, Crenshaw was apprehended by Officer Peterson, also a member of the Rochester Police Department. Officer Peterson had responded to the 911 broadcast. No gun was found on Crenshaw's person, but currency in various denominations (one ten-dollar bill, one five-dollar bill, and twenty-five one-dollar bills) were discovered. Harris had reported that he was not sure of the exact amount of money stolen, but he remembered that it was mostly one-dollar bills. The police brought Crenshaw back to the crime scene where Harris, without hesitation, identified him as the robber.

When he was brought to the police station for questioning, Crenshaw gave a false name and claimed not to be the robber. He explained that he was in the area because he was looking to have a "quick fuck" with a woman named "Monique" before he had to go see his regular girlfriend. However, he was unable to provide the police with the woman's last name or address. Crenshaw claimed that he was a "dope dealer," not a robber, and that the money found in his

pockets was proceeds from selling "weed." He stated that "on the street," buyers paid him for five-dollar bags of "weed" with one-dollar bills. Crenshaw also accused the police of stopping him solely because he was black.

Crenshaw testified in his own behalf before the grand jury which indicted him on one count of first degree robbery. During the subsequent suppression hearing, the court held admissible Crenshaw's statements to the police, the show-up identification, and the physical evidence seized at the time of his arrest.

At Crenshaw's jury trial, the defense called Deborah Eabron ("Eabron"), who was at the drive-through window of a nearby bank and who told the police that she had seen Harris chasing a man in dark-colored clothing. Eabron, who had not seen the man's face and could not identify the robber, testified for the defense at trial. At trial, she described the robber as wearing a "green waist jacket [*sic*] and dark pants, either black or dark, navy." T.267.[1]

The jury returned a verdict convicting Crenshaw of one count of first degree robbery as charged in the indictment. He was sentenced as a second felony offender to a determinate sentence of twenty years incarceration.

The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed his conviction on December 27, 2000. *People v. Crenshaw*, 278 A.D.2d 897 (4th Dept. 2000). The New York Court of Appeals denied leave to appeal on April 16, 2001. *People v. Crenshaw*, 96 N.Y.2d 799 (2001). Crenshaw collaterally attacked his conviction by means of a motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 which was denied by the trial court. Crenshaw also challenged the

---

[1] Citations to "T.__" refer to the trial transcript.

performance of his appellate counsel by means of an application for a writ of error *coram nobis* which was summarily denied by the intermediate appellate court.

Crenshaw filed his initial habeas petition in this Court on or about August 15, 2002. Thereafter, the petition was held in abeyance so that he could return to state court in order to exhaust a claim of ineffective assistance of appellate counsel in an application for a writ of error *coram nobis*. Crenshaw filed his amended habeas petition on or about April 3, 2003. For the reasons set forth below, I conclude that none of the claims raised in Crenshaw's initial petition or amended petition warrant habeas relief.[2]

## DISCUSSION

### Standard of Review

To prevail under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") in 1996, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

---

[2] Respondent raises the failure to exhaust with respect to Crenshaw's claim that he improperly was denied a hearing to challenge the composition of the superior court jury pool, stating that Crenshaw did not pursue this claim in the Court of Appeals. However, I find that appellate counsel did raise this argument when he sought leave to appeal, and therefore the claim is exhausted and properly before this Court. *See* 28 U.S.C. § 2254(b)(1); *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054 (1995).

**Merits of the Petition**

1.      *Brady* **violation**

Crenshaw contends that he was improperly indicted because certain allegedly exculpatory material was not provided to him prior to the grand jury's deliberations, namely, the investigative report completed by Officer McNamara in which he states that eyewitness Eabron saw Harris, the robbery victim, chasing a "male black wearing dark colored coat & pants" [*sic*]. *See* A.185. According to Crenshaw, the report is exculpatory on its face because it described the suspect being chased as wearing clothes substantially different from the description of the robber's clothes given by the victim to the police. On direct appeal, the court rejected this claim, finding that the report did not contain exculpatory evidence.

To the extent that the prosecution knows of material evidence favorable to a criminal defendant, it has a due process obligation to disclose that evidence. *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 431 (1995); *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("*Brady*") (holding that suppression by the prosecution of evidence favorable to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"). *Brady* matter includes not only exculpatory evidence going to the heart of the defendant's guilt or innocence, but also impeachment evidence having the potential to undermine the credibility of a significant prosecution witness. *See, e.g., Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (A "jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence.").

On the facts before me, I can find no violation of the mandates set forth in *Brady* and its

progeny. First of all, I question whether the report in fact was exculpatory; there is no reason why army-green camouflage-patterned clothing could not also be described as dark-colored. More important, there was no "withholding" within the meaning of *Brady*. A defendant is not entitled to have the prosecutor turn over all potentially exculpatory and impeaching material on demand, let alone prior to the meeting of the grand jury. All that the Constitution requires is that the material be disclosed in time for its effective use at trial. *United States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001) (citing *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) ("It is not feasible or desirable to specify the extent or timing of [the] disclosure *Brady* and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made."), and, *inter alia*, *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 532 (4th Cir. 1985) (same); *United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984) (same); *United States v. Olson*, 697 F.2d 273, 275 (8th Cir. 1983) (same); *United States v. Allain*, 671 F.2d 248, 255 (7th Cir. 1982) (same); *United States v. Pollack*, 534 F.2d 964, 973 (D.C. Cir. 1976) (same)). Without a doubt, the defense was provided the report prior to trial. In fact, defense counsel called Eabron as a witness. Because Crenshaw had sufficient opportunity to make use of the allegedly exculpatory information, there has been no *Brady* violation. Habeas relief is not warranted on this claim.

**2.      Erroneous introduction of evidence of immoral acts and prior misconduct**

Crenshaw claims that the prosecution improperly was permitted to introduce evidence of his prior immoral acts and uncharged crimes, as well as his statement to the police that the only reason he had been stopped was because he was black. On direct appeal, the court agreed with Crenshaw that the trial court erred in admitting his statement that the police arrested him solely

because he is black: "Although that statement was not relevant to any issue at trial, its erroneous admission is harmless error because the statement was neither incriminating nor prejudicial[.]" *People v. Crenshaw*, 278 A.D.2d at 898 (citations omitted). The court summarily denied Crenshaw's remaining evidentiary claims as without merit. *Id.*

Federal habeas corpus relief will not lie to rectify errors of state constitutional, statutory, or procedural law unless a federal constitutional issue is also presented. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (A federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States;" it is not the province of a federal habeas court to re-examine state court determinations of state law.). "The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998), *cert. denied*, 525 U.S. 840 (1998) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).  Thus, the habeas court must ask "whether the erroneously admitted evidence, viewed objectively in light of the entire record . . . was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it."  *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985); *accord, e.g.*, *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992).

As part of the prosecution's direct case, the officer who took Crenshaw's statement was permitted to testify that Crenshaw told him (1) that he was in the vicinity of the crime because he was looking to have a "quick fuck" with a woman he knew; and (2) that he was in possession of the same denominations of currency as those taken during the robbery because was a "dope dealer" and sold "weed." At that point, the trial court interrupted the prosecutor's examination of

the officer and gave a curative instruction.[3] The officer then testified that Crenshaw said that the only reason he had been stopped was because he was black. *See* T.217-20.

With regard to Crenshaw's statement that he was merely looking to have a brief sexual encounter with a woman other than his girlfriend, I agree that it had some bearing on his credibility as a witness. However, in this Court's opinion, there was no reason for the officer to quote Crenshaw's vulgar phrase verbatim (and repeat it several times). Nevertheless, under New York state law, "trial courts have broad discretion in deciding whether a prosecutor should be precluded from impeaching a defendant's credibility by reference to prior immoral, vicious or criminal acts[.]" *People v. Hall*, 99 A.D.2d 843 (2d Dept. 1984) (citing *People v. Bennette*, 56 N.Y.2d 142, 146-147 (1982)); *see also People v. Arce*, 309 A.D.2d 1191 (4th Dept. 2002) (where defendant charged with numerous offense relating to sexual molestation and physical menacing of his sons, court properly allowed prosecution to present proof on case-in-chief concerning uncharged incident in which defendant, while brandishing a knife, chased one son outside the house; "[t]he probative value of that evidence on the issue of forcible compulsion outweighed its prejudicial tendency to establish that defendant had a criminal propensity").

Crenshaw's description of himself as a "dope dealer" and his statement that he sold five dollar-bags of "weed" and that people "on the street" normally paid him with one-dollar bills were relevant to determining how he came to be in possession of the same amount of money in the same denominations as that taken during the robbery. *See People v. Santarelli*, 49 N.Y.2d

---

[3] "Before we go on, ladies and gentlemen, let me just advise you that I have allowed the People to introduce evidence here that the Defendant said something about weed. The fact that, that this Defendant may have committed another crime of some sort or committed another bad act of some sort is no proof that he possessed propensity or disposition to commit the crime charged in this indictment. It is not offered for that purpose. And must not be considered by you for that purpose." T.220.

241, 247 (1980) ("[W]here the evidence of prior, uncharged criminal conduct has a bearing upon a material aspect of the People's case other than the accused's general propensity toward criminality, our cases have recognized that the probative value of the evidence justifies its admission, notwithstanding the potential for incidental prejudice.").  It is well settled that evidence of uncharged crimes may properly be admitted when, as here, such testimony is needed as background material or to complete a narrative or explain a sequence of events. *See*, *e.g.*, *People v. Till*, 87 N.Y.2d 835, 837 (1995) (Evidence of uncharged crimes "may be allowed when . . . it bears on the motive and state of mind in relation to an avoidance of apprehension during immediate flight from a crime and is found to be "needed as background material" or to "complete the narrative of the episode[.]") (internal citations and quotation marks omitted). Crenshaw's statements about his uncharged, drug-related activities, especially how he came to be in possession of a large quantity of one-dollar bills, was so inextricably interwoven with the crime charged that its admission was not error under state law. *See People v. Jeanty*, 268 A.D.2d 675, 679 (3d Dept. 2000) (citing *People v. Vails*, 43 N.Y.2d 364, 368-69 (1977)). Moreover, the trial court's careful limiting instructions counsel against a finding of constitutional error. *See*, *e.g.*, *Brooks v. Artuz*, 2000 WL 1532918, at *9 (S.D.N.Y. Oct. 17, 2000) ("[G]iven the trial court's careful limiting instructions, the admission of the uncharged conduct could not be found to be unfairly prejudicial to the petitioner."); *see also Greer v. Miller*, 483 U.S. 756, 766 n. 8 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence . . . , unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions.").

Crenshaw's statement that the police stopped him on the basis of his race was, as the state

court found, erroneously admitted since it bore no relevance to any issue presented at trial.

However, the appellate court's finding that the error was harmless because the statement was

neither inculpatory nor prejudicial was not an unreasonable application of clearly established

federal law. Accordingly, Crenshaw's claims of evidentiary error do not warrant habeas relief.

**3.       Fourth Amendment claims**

Crenshaw contends that the police lacked probable cause to arrest him, and therefore his

arrest was in violation of the Fourth Amendment.  He contends that because his arrest was

unconstitutional, the "unattenuated fruits of the seizure"–namely, his money and clothing, his

statement to the police, and the show-up identification procedure –also must be suppressed.

Crenshaw finally asserts that the police improperly searched his pockets, rendering the search

unreasonable.

In general, state court defendants are barred from obtaining habeas relief based upon

Fourth Amendment claims. "Where the State has provided an opportunity for full and fair

litigation of a Fourth Amendment claim, a state prisoner may not be granted habeas corpus relief

on the ground that evidence obtained in an unconstitutional search or seizure was introduced at

his trial."  *Stone v. Powell*, 428 U.S. 465, 494 (1976) (footnotes omitted).  The Second Circuit

has noted that *Stone* requires only that "the state have provided the *opportunity* to the state

prisoner for full and fair litigation of the Fourth Amendment claim."  *Gates v. Henderson*, 568

F.2d 830, 839 (2d Cir. 1977) (*en banc*), *cert. denied*, 434 U.S. 1038 (1978) (emphasis added).  A

federal court may undertake habeas review only in one of two instances: (1) "[i]f the state

provides no corrective procedures at all to redress Fourth Amendment violations," or (2) if "the

state provides the process but in fact the defendant is precluded from utilizing it by reason of an

unconscionable breakdown in that process. . . ." *Id.* at 840; *accord Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992).

A petitioner receives a "full and fair opportunity" to litigate his Fourth Amendment claim where the state provides a "'statutory mechanism' for suppression of evidence tainted by an unlawful search and seizure." *McPhail v. Warden, Attica Corr. Facility*, 707 F.2d 67, 69 (2d Cir. 1983). Here, New York clearly affords defendants the requisite corrective procedures. *See* N.Y. Crim. Proc. Law § 710.10 *et seq.*; *see also Capellan*, 975 F.2d at 70 (noting that "federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y. Crim. Proc. Law § 710.10 *et seq.* (McKinney 1984 & Supp.1988) as being facially adequate").

Crenshaw may not raise his Fourth Amendment claims on habeas review because he was provided with, and indeed took full advantage of, the opportunity to fully adjudicate these matters in state court. At the trial court level, defense counsel filed a motion contesting the validity of the police officers' arrest of Crenshaw. Following a hearing, the court denied the motion to suppress in an oral opinion on the record setting forth its findings of fact and conclusions of law. Crenshaw raised his Fourth Amendment claims in a *pro se* supplemental brief on direct appeal, and he also filed a motion to vacate his conviction on the ground that his arrest was without probable cause; this, too, was denied. The Appellate Division subsequently denied leave to appeal with respect to both of his applications. Crenshaw's various applications at the trial court and appellate levels challenging his arrest clearly show that he was given an opportunity for a "full and fair" litigation of his Fourth Amendment claims. In order for Crenshaw's Fourth Amendment claims to be cognizable on habeas review, therefore, it must be

based on a contention that there was an "unconscionable breakdown" in the underlying state

court procedural mechanism.  *See Capellan*, 975 F.2d at 70.

Crenshaw cannot demonstrate that an "unconscionable breakdown" occurred in the courts

below. His assertions that the state courts were incorrect and defense counsel incompetent do not

constitute the sort of "breakdown" referred to in *Gates v. Henderson*. Nor is Crenshaw's

dissatisfaction with the outcome of the suppression hearing evidence of a "breakdown" in the

state's procedures for litigating Fourth Amendment claims. Rather, an "unconscionable

breakdown in the state's process must be one that calls into serious question whether a

conviction is obtained pursuant to those fundamental notions of due process that are at the heart

of a civilized society." *Cappiello v. Hoke*, 698 F. Supp. 1042, 1050 (E.D.N.Y. 1988), *aff'd*, 852

F.2d 59 (2d Cir. 1988) (*per curiam*); *accord*, *Capellan*, 975 F.2d at 70 (observing that some sort

of  "disruption or obstruction of a state proceeding" of an egregious nature, *e.g.*, the bribing of a

trial judge, typifies an unconscionable breakdown). No such disruption is discernable on the

record before me. Therefore, Crenshaw's Fourth Amendment claims are not cognizable on

habeas review.

**5.**     ***Batson* claim**

Crenshaw contends that the prosecutor used his peremptory strikes in a racially

discriminatory manner to prevent black jurors from being seated on the jury panel. In *Batson v.*

*Kentucky*, 476 U.S. 79 (1986), the Supreme Court resolved certain evidentiary problems faced by

defendants attempting to establish racial discrimination in the exercise of peremptory challenges.

*Batson* held that a defendant can establish a *prima facie* case of purposeful discrimination by

offering evidence solely from the *voir dire* at his trial.  *Batson*, 476 U.S. at 96 (rejecting burden

of proof imposed by *Swain v. Alabama*, 380 U.S. 202 (1965)).  The Supreme Court went on to establish a three-step burden-shifting framework for evaluating a claim that a peremptory strike was race-based.  *Batson*, 476 U.S. at 96-98.

First, the movant–*i.e.*, the party challenging the other party's attempted peremptory strike–must make a *prima facie* case that the nonmovant's peremptory challenge is based on race. *Id.*; *Hernandez v. New York*, 500 U.S. 352, 358 (1991).  Next, the nonmovant must adduce a race-neutral reason for the challenge.  *Batson*, 476 U.S. at 97-98; *Hernandez*, 500 U.S. at 358-59. At this step, the nonmovant's burden is quite low.  *See Purkett v. Elem*, 514 U.S. 765, 768 (1995) (*per curiam*) (race-neutral reason given need not be persuasive or even plausible).

Lastly, the trial court must determine whether the movant carried its burden of demonstrating by a preponderance of the evidence that the peremptory challenge at issue was based on race.  *Batson*, 476 U.S. at 96, 98; *Hernandez*, 500 U.S. at 359.   The burden remains with the moving party throughout the three *Batson* steps; "[i]t is not until the *third* step that the persuasiveness of the justification becomes relevant–the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett*, 514 U.S. at 768 (emphasis in original).

*Batson* held that to make out a *prima facie* case, a defendant must demonstrate that (1) he is a member of a "cognizable racial group"; (2) that the prosecutor has exercised peremptory challenges to remove from the juror *venire* persons of the defendant's race; and (3) that these facts and any other relevant circumstances raise an inference that the prosecutor used the peremptory challenges to exclude potential jurors.  *Batson*, 476 U.S. at 96.

During *voir dire*, defense counsel made a *Batson* objection with regard to the prosecutor's

striking of juror number ten, a black man named Mr. Hall, after two other black jurors had been

dismissed from the jury pool:

> . . . [The juror] is a male black. My client is a male black. This is the second
> African American black person taken off by the District Attorney. I submit that
> shows a pattern as Mr. Hall [the juror]. . . said nothing different than anybody
> else.

T.104. The parties and the court engaged in a brief colloquy wherein it was revealed that of the

two black jurors whom defense counsel claimed were wrongly stricken, one was removed with

the defense's consent, T.105, and the other was removed for cause upon the juror's request,

T.106.  Apparently, the latter juror had a conflict because she was attending college and would

suffer dismissal from one of her courses if she were to miss three class sessions. T.67. Defense

counsel challenged the removal of that juror at the time, stating that the court subpoena should be

sufficient to excuse her from class. However, he did not mention the issue of her race. T.68.

> The prosecutor then explained his reasons for striking Mr. Hall:

> . . . [H]e was evasive. He didn't come–He wasn't forthright. He didn't come out
> and tell us about the–If I hadn't persisted, he would not have told me about his
> brother being convicted of a felony and him visiting his brother in jail. Also, about
> a friend who was convicted of murder, and he writes to him. This is not the type
> of Juror that I would pick whether, regardless of raise [*sic*], and has nothing to do
> with the raise [*sic*]. In fact, I have excused other jurors for the reason that they
> have either family members that are convicted of crimes or are visiting them and
> might be concerned about sentencing. I think that this is a raise [*sic*] neutral
> reason, and I don't think, counsel, your Honor, has overcome that race neutral
> reason. It is incumbent upon, upon him to do that, and we have to make a finding
> as to that.

T.107. The court agreed, finding that the prosecutor's reasons for striking Mr. Hall were race-

neutral. *Id.* A review of the record substantiates the prosecutor's articulated reasons. *See* T.92-94.

> It thus appears that the prosecutor only exercised one peremptory strike which was

challenged by the defense as being racially-based. The Court doubts that this is sufficient to establish the third element of a *prima facie Batson* claim. *See United States v. Stavroulakis*, 952 F.2d 686, 696 (2d Cir.) (holding that "[r]eference merely to the race of one excused venireman, without more, is insufficient to raise an inference of discrimination" under *Powers v. Ohio*[,499 U.S. 400 (1991)]), *cert. denied*, 504 U.S. 926 (1992); In *Stavroulakis*, the Second Circuit went on to suggest, however, that "[w]hen other factors such as patterns of strikes or lines of questioning combine with race, the inference of discrimination may arise." *Id.* On the record before it, this Court can find no additional factors that would, in combination with the dismissal of Mr. Hall, create an inference of discrimination.

Even assuming for the sake of argument that Crenshaw has made out a *prima facie Batson* challenge, he cannot fulfill his burden on the remaining steps since the prosecutor articulated a legitimate explanation for his decision to excuse Mr. Hall. *Compare with Copeland v. Walker*, 258 F. Supp.2d 105, 126 (E.D.N.Y. 2003) (finding that record showed "plausible, race-neutral reasons for the exercise of peremptory challenges" where one excused black jury had a "close" cousin who had previously been convicted of multiple murders) (citing *United States v. Lampkins*, 47 F.3d 175 (7th Cir. 1995) (fact that prospective juror had relatives convicted of a crime justified peremptory challenge despite allegation of purposeful discrimination)); *People v. Barney*, 295 A.D.2d 1001, 743 N.Y.S.2d 793, 794 (4th Dept. 2002) (holding that trial court properly determined that the prosecutor's explanation for excusing black female prospective juror was race-neutral and not pre-textual where juror stated that her son had been convicted twelve years earlier and that she had strong feelings about the outcome of the trial and the way in which it was handled); *People v. Anaya*, 206 A.D.2d 380, 614 N.Y.S.2d 59, 60 (2d Dept. 1994)

(fact that prospective juror's son recently had been convicted of crime in county in which

defendant was being prosecuted was legitimate race-neutral ground for exercising peremptory

challenge); *People v. Dorsey*, 3 A.D.3d 590, 591 (3d Dept. 2004) (affirming trial court's

rejection of *Batson* challenge where, although pattern of discrimination "arguably established,"

the People's explanation–that the juror's answers reflected potential bias against correction

officers and sympathy toward inmates stemming from her experiences with and ill will toward

her ex-husband, a correction officer–was race-neutral and not shown to be pre-textual).

Thus, the prosecutor's stated reason at Crenshaws's trial clearly was sufficient to fulfill

the state's obligation at the second stage of the *Batson* inquiry.  *See Purkett v. Elem*, 514 U.S. at

768.  "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's

explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason

offered will be deemed race neutral." *Hernandez*, 500 U.S. at 360 (plurality opinion). On the

record before me, I can find neither overt nor implied discriminatory intent in the prosecutor's

reason for striking Mr. Hall from the jury.

With regard to the third step of the burden-shifting analysis, Crenshaw offered nothing at

trial, nor has he adduced anything on habeas review, to show that the prosecutor purposefully

discriminated against the excused black juror. Thus, Crenshaw has supplied the Court with no

evidence on which appellate counsel could have argued persuasively that the prosecutor engaged

in discriminatory tactics, which is fatal to his ineffective assistance of counsel claim, *see infra*,

premised on the composition of the jury pool.

**6.     Victim gave false testimony at the grand jury hearing**

Crenshaw complains that the victim, Robert Harris, "never gave a description of a blue

hoody sweatshirt in his description" of the robbery suspect. Crenshaw points out that the first time Harris ever mentioned a "blue hoody sweatshirt" was at the grand jury hearing. He surmises that the prosecutor, after checking Crenshaw's property sheet and seeing that he had a blue hooded sweatshirt when he was booked, told Harris to mention the sweatshirt at the grand jury proceeding.

To the extent Crenshaw is asserting defects in the grand jury proceeding, such a claim is not cognizable because Crenshaw was convicted by a jury after a trial. The trial jury's guilty verdict necessarily renders any irregularities before the grand jury harmless as it establishes not only that there existed probable cause to indict the defendant, but also that the defendant was "in fact guilty as charged beyond a reasonable doubt." *United States v. Mechanik*, 475 U.S. 66, 68 (1986); *Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989) (holding that habeas petitioner's "claims of impropriety before the grand jury in this case concern[ing] the sufficiency of the evidence, a failure to develop exculpatory evidence by the prosecutor, the presentation of prejudicial evidence and error in explaining the law" . . . were "cured in the trial before the petit jury, which convicted"). Moreover, Crenshaw provides absolutely no basis for this claim of collusion apart from his own suspicions. This claim cannot serve as a basis for habeas relief. *See*, *e.g.*, *Medina v. Herbert*, 1998 WL 799173, at *4 (S.D.N.Y. Nov. 16, 1998) (finding that petitioner's claims that the case presented to the grand jury was incomplete and misleading, as well as deliberately prepared by the prosecutor to confuse and deceive, were not cognizable on habeas review; petitioner's contention that the decision to indict was based on "distorted, manipulated facts and perjured testimony" also not cognizable).

However, because Crenshaw raises other claims relating to the victim's supposed

"perjury" before the grand jury, I feel that I must address this issue. First of all, there is absolutely

no evidence that the victim or any of the other witnesses testified falsely during Crenshaw's

criminal proceeding. The fact that Harris, the victim, neglected to mention that the robber was

wearing a blue hooded sweatshirt under his camouflage outfit when the police spoke with him

immediately after the incident does not, without more, establish that he committed perjury when

he testified otherwise before the grand jury. In any event, even were the blue hooded sweatshirt

removed from the equation, the police still had probable cause to arrest Crenshaw because he fit

the description in the police bulletin–a black male with a short build wearing a camouflage-

patterned jacket and pair of pants.

Finally, I note that defense counsel cross-examined the victim about these discrepancies

at trial and thereby properly placed before the jury the issue of whether the victim's recollection

was accurate. Harris stated that he did not mention the sweatshirt because the police did ask what

the robber was wearing underneath his outer clothing; it was for the jury to decide whether this

was a credible explanation. In sum, none of Crenshaw's allegations concerning the victim's

grand jury testimony provide a basis for habeas relief.

**7.      Ineffective assistance of appellate counsel**

    **a.      Legal standard**

In order to prevail on a claim of ineffective assistance of counsel within the framework

established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas

petitioner must satisfy a two-part test. First, a petitioner must demonstrate that counsel's

performance was so deficient that counsel was not functioning as "counsel" within the meaning

of the Sixth Amendment to the Constitution. *Id.* at 688. In other words, a petitioner must show

that his attorney's performance "fell below an objective standard of reasonableness." *Id.* Second,

a petitioner must show that counsel's deficient performance prejudiced him. *Id.* at 694. To

establish the "prejudice" prong of the *Strickland* test, a petitioner must show that a "reasonable

probability" exists that, but for counsel's error, the outcome of the trial would have been

different. *Id.* at 694.  The issue of prejudice need not be addressed, however, if a petitioner is

unable to demonstrate first that his counsel's performance was inadequate. "[T]here is no reason

for a court deciding an ineffective assistance claim to . . . address both components of the inquiry

if the defendant makes an insufficient showing on one." *Id.* at 697. Although the *Strickland* test

was formulated in the context of evaluating the effectiveness of trial counsel, it has been

extended to claims regarding the performance of appellate counsel. *Mayo v. Henderson*, 13 F.3d

528, 533 (2d Cir. 1994) (citing, *e.g.*, *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992)).

Appellate counsel need not present every non-frivolous argument that could be made on

petitioner's behalf.  *Mayo*, 13 F.3d at 533; *see also Evitts v. Lucey*, 469 U.S. 387, 394 (1985)

(emphasizing that appellate counsel "need not advance every argument, regardless of merit,

urged by the appellant"). Moreover, reviewing courts should not employ hindsight to

second-guess an appellate attorney's choices concerning strategy.  *Mayo*, 13 F.3d at 533; *see also*

*Jones v. Barnes*, 463 U.S. 745, 754 (1984) ("For judges to second-guess reasonable professional

judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by

a client would disserve the [ ] goal of vigorous and effective advocacy[.]"). Omission of

insignificant claims that will likely be unsuccessful does not prejudice a defendant. *See Mayo*, 13

F.3d at 534 ("To establish prejudice in the appellate context, a petitioner must demonstrate that

'there was a "reasonable probability" that [his] claim would have been successful . . . .'")

(alteration in original) (quoting *Claudio v. Scully*, 982 F.2d at 803)).  However, a habeas

petitioner may establish constitutionally inadequate performance if he shows that his appellate

counsel omitted material and obvious issues while pursuing arguments that were patently and

significantly weaker. *Mayo*, 13 F.3d at 533.

### b.    Grounds for finding ineffectiveness

#### i.    Failure to properly argue claim of racially-biased jury composition

Crenshaw's allegations relating to the composition of his jury are confusing. He first

states that "trial counsel failed to renew his motion with the composition of the jury pool." It is

not clear whether he is alleging that trial counsel was ineffective on this basis, or that appellate

counsel was deficient in failing to argue the ineffectiveness of trial counsel.  To the extent that

this claim can be read as suggesting that trial counsel erred in his handling of *voir dire* and

objecting to peremptory challenges, it is without merit because, as discussed above, Crenshaw

does not have a viable *Batson* claim.

Crenshaw goes on assert that appellate counsel "failed to investigate and show the court's

[*sic*] that their [*sic*] was a disproportionately low number of minorities on [his] jury." Petitioner's

Reply Memorandum of Law at 42 (Docket #23). Crenshaw points to the fact that there were

eleven whites on his jury but only one black person as evidence that the composition of the jury

pool was racially biased. *Id.* Crenshaw seems to be arguing both a *Batson* violation–that the

prosecutor engaged in racially discriminatory tactics to prevent black jurors from being

impaneled on his jury, and an equal protection violation–that the system of jury selection resulted

in a disproportionately low number of minorities in the superior court jury pool. As discussed

above, Crenshaw's *Batson* claim is without merit.

Turning to his second claim, I note that it is well established that under the Sixth and Fourteenth Amendments, a criminal defendant is guaranteed a trial by a jury "drawn from a source fairly representative of the community. . . ." *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975); *accord*, *e.g.*, *United States v. Jackman*, 46 F.3d 1240, 1244 (2d Cir. 1995). There is no constitutional requirement, however, that the "petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Id.* In other words, defendants "are not entitled to a jury of any particular composition, *Fay v. New York*, 332 U.S. 261, 284 (1947); *Apodaca v. Oregon*, 406 U.S [404], at 413 [(1972)] (plurality opinion); but the jury wheels, pools of names, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.*; *see also Jackman*, 46 F.3d at 125 ("[T]he Sixth Amendment guarantees the opportunity for a representative jury venire, not a representative venire itself.") (citing *Roman v. Abrams*, 822 F.2d 214, 229 (2d Cir. 1987), *cert. denied*, 489 U.S. 1052 (1989)).

Apart from his bare and unsupported allegation that "Monroe County is known for giving black defendant's [*sic*] all white jury's [*sic*]," Reply Memorandum of Law at 42 (Docket #23), Crenshaw makes no attempt to show that blacks or other minorities were systematically excluded from the jury selection process. Thus, there is no basis upon which a reviewing court could conclude that Crenshaw's Sixth Amendment rights to a representative jury were violated. Crenshaw was not prejudiced by appellate counsel's omission of this claim since it would not have succeeded on appeal.

In closing, I note that appellate counsel raised and cogently presented an argument questioning the validity of the process used to compose the jury pool for superior court trials in

Monroe County. Simply because that argument was unsuccessful does not provide a basis for finding appellate counsel's performance deficient. After reviewing appellate counsel's well-written and thorough brief on direct appeal, it is evident that Crenshaw received competent representation.

### ii.      Failure to argue that trial counsel was ineffective

As hereinafter discussed, I find that defense counsel provided Crenshaw with constitutionally effective representation during pre-trial proceedings, at trial and at sentencing. There was no basis upon which appellate counsel successfully could argue that trial counsel was ineffective.

### 8.      Ineffective assistance of trial counsel

Crenshaw argues that he was prejudiced by defense counsel's incompetent handling of his Fourth Amendment claims. In particular, Crenshaw claims that the arresting police officer committed perjury at his probable cause hearing. According to Crenshaw, Officer Peterson falsely testified that he was the person who apprehended Crenshaw and that he gave different testimony about the contents of the police broadcast before the grand jury and at the probable cause hearing. At the outset, Crenshaw provides no basis for his contention that Officer Peterson was *not* the arresting officer. Furthermore, the discrepancies that Crenshaw points out in Officer Peterson's testimony are inconsequential.[4]

---

[4] According to Crenshaw's quotations of the relevant testimony, at the grand jury, Officer Peterson testified that the police bulletin said that the suspect was five feet, six inches tall and wearing a "camouflage army suit;" he did not mention a handgun. In fact, the bulletin actually said that the suspect was "short," wearing a "green army jacket,"and carrying a gun. At the probable cause hearing, Officer Peterson testified that the broadcast described a male black carrying a handgun and wearing "camouflage army-type clothing." Finally, at trial, Officer Peterson stated that he recalled the bulletin as describing a "male, black, short in height, with camouflage clothing." *See* Petitioner's Memorandum of Law in Support of *Coram Nobis* Application at 13-14, A.374-375. In no way would these minor differences call into question whether the police had probable cause to stop Crenshaw. Therefore, they

Crenshaw also contends that he had a conflict of interest with the assistant public

defender who represented him. Again, Crenshaw has provided no factual basis for this claim. He

states that his guilty verdict "only confirms what he knew in his heart[,] that trial counsel was not

investigating important issues in petitioner's case."

Contrary to Crenshaw's contentions, he received the effective assistance of counsel at his

trial. Defense counsel competently and zealously litigated all of Crenshaw's Fourth Amendment

claims that had potential merit. He also presented a credible defense theory at trial—that the

prosecution could not prove identity beyond a reasonable doubt. Defense counsel pointed out that

the robbery occurred quickly and the victim, Harris, did not have much time to observe what was

happening. He also argued that Harris did not have an opportunity to see the face of the person

who robbed him. Counsel highlighted the inconsistencies between the Harris's grand jury

testimony and his statements at the time of the incident, forcing Harris to admit that, in his

description to the police, he did not mention the fact that the robber was wearing a blue hooded

sweatshirt. Counsel also pointed out discrepancies between the victim's description of the money

taken and the money found on Crenshaw when he was arrested. Counsel vigorously cross-

examined all of the prosecution's witnesses, and he made much of the failure of the police to

retrieve the gun allegedly used in the robbery, arguing that it proved that Crenshaw did not

commit the robbery. Counsel emphasized that the other eyewitness, Eabron, testified at trial that

Crenshaw was not the person whom she saw the victim chasing.

Crenshaw's allegations about defense counsel do not evidence actual ineffectiveness; they

---

were not an additional, separate basis for argument at the suppression hearing.  In any event, defense counsel
pointedly cross-examined Officer Peterson about the discrepancies in his testimony at trial.

are merely criticisms by a defendant dissatisfied with the outcome of his trial. Contrary to Crenshaw's opinion, defense counsel competently litigated the Fourth Amendment issues presented by Crenshaw's case. The arguments that counsel, in Crenshaw's view, should have raised would not have succeeded, and therefore Crenshaw was not prejudiced by counsel's failure to raise them. After reviewing the record in this case, it is apparent that Crenshaw received constitutionally effective representation at all stages of his criminal proceeding. Accordingly, this claim provides no basis for habeas relief.

## CONCLUSION

For the reasons stated above, William Crenshaw's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because Crenshaw has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:      June 02, 2005
            Rochester, New York.

-24-